FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

2014 FEB 21   PM 4:3

WILLIAM W. BLEVINS
CLERK





# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**INDICTMENT FOR CONSPIRACY TO ILLEGALLY
DISPENSE CONTROLLED SUBSTANCES, USE OF A TELEPHONE TO
FACILITATE THE CONSPIRACY, CONSPIRACY TO COMMIT MONEY
LAUNDERING, CONSPIRACY BY A PUBLIC OFFICIAL TO ACCEPT BRIBES,
CONSPIRACY TO ILLEGALLY RECEIVE "PROPERTY" FROM ANOTHER
UNDER COLOR OF OFFICIAL RIGHT, OBSTRUCTION OF JUSTICE TO
PREVENT COMMUNICATION TO LAW ENFORCEMENT ABOUT
<u>FEDERAL CRIMES, AND FALSE STATEMENTS TO A FEDERAL AGENT</u>**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL DOCKET NO. 14 - 40** |
| **v.** | * | **SECTION:** SECT. E MAG. 3 |
| **JOSEPH J. MOGAN, III, M.D.** | * | **VIOLATIONS:** 21 U.S.C. § 846 |
| | | 21 U.S.C. § 843(b) |
| **TIFFANY MILLER** | * | 18 U.S.C. § 1956(h) |
|    a/k/a Tiffany Cardwell | | 18 U.S.C. § 1951 |
|    a/k/a Tiffany Gambino | * | 18 U.S.C. § 1512 (b)(3) |
| | | 18 U.S.C. § 1001 |
| **DONALD NIDES** | * | 18 U.S.C. § 371 |
| | | 18 U.S.C. § 2 |
|      * | *     * | |

The Grand Jury charges that:

## COUNT 1
### (Conspiracy to Dispense Controlled Substances)

A.    <u>AT ALL MATERIAL TIMES HEREIN:</u>

### <u>The Clinics</u>

1.      Beginning at a time unknown, but prior to November 2003, and continuing until

on or about the date of this indictment, defendants, **TIFFANY MILLER, a/k/a Tiffany**

Fee ____
__ Process ____
X Dktd ____
__ CtRmDep ____
__ Doc. No. ____

1

Cardwell, a/k/a Tiffany Gambino, and JOSEPH J. MOGAN, III, M.D., organized and

managed "Pain Management Clinics" in the New Orleans metropolitan area, including Metairie

and Slidell, Louisiana.   The companies were Omni Pain Management, LLC (hereinafter "Omni"),

located first at 2701 David Drive, Metairie, Louisiana, and later at 2705 Independence Street,

Metairie, Louisiana, and Omni Pain Management Plus, LLC (hereinafter "Omni PLUS") located at

700 Gause Blvd., Slidell, Louisiana (hereinafter collectively referred to as "Omni Clinics").

While Miller's former husband initially owned an interest in the Omni Clinics, he died of a drug

overdose in January 2011.

### Doctor

2.       JOSEPH J. MOGAN, III, a physician licensed by the Louisiana Board of

Medical Examiners, New Orleans, Louisiana, Medical License No. LA-022700 and further

licensed by the Drug Enforcement Administration ("DEA"), Registration No. BM6633526 was

authorized to practice medicine in the State of Louisiana and to prescribe Schedules II through V

controlled substances.   MOGAN referred to Schedule II and III prescriptions as "dope"

prescriptions.

### Law Enforcement

3.       DONALD NIDES was a law enforcement officer with the New Orleans Police

Department (hereinafter "NOPD"), who also was deputized as a DEA Task Force officer

assigned to the DEA Diversion Tactical Squad (hereinafter "DEA Tactical Diversion Task Force

member"), from 2003 until March 14, 2008.   These Task Force members had the powers of

federal law enforcement personnel and had the responsibility to investigate and review the

activities of pain management clinics operating within Louisiana to ensure that the clinics were

in compliance with federal and state law.   A principal responsibility was to determine if doctors

practicing within pain management clinics were prescribing Scheduled drugs for a legitimate medical purpose in the usual course of their professional practice.

## General Terms and Definitions

4.     Oxycodone is a Schedule II narcotic drug controlled substance. It is commonly marketed as Oxycontin, Percodan, Percocet, Endocet, Roxiocodone, and Tylox.

5.     MS Contin is a Schedule II narcotic drug controlled substance.

6.     Methodone is a Schedule II narcotic drug controlled substance.

7.     Hydromorphone is a Schedule II narcotic drug controlled substance.   It is commonly marketed as Dilaudid.

8.     Opano is a Schedule II narcotic drug controlled substance.   It is commonly marketed as Oxymorphone.

9.     Hydrocodone is a Schedule III narcotic drug controlled substance which also contains acetaminophen.   It is commonly marketed as Lorcet, Lortab, Vicodin, Norco, and Xodol.

10.     Butalbital is a barbiturate.   When in a compound with aspirin and caffeine, butalbital is a Schedule III controlled substance that is commonly marketed as Fiorinal.

11.     Alprazolam is an anti-anxiety Schedule IV controlled substance.   It is commonly marketed as Xanax.

12.     Diazepam is a hypnotic and sedative Schedule IV controlled substance.   It is commonly marketed as Valium.

13.     Clonazepam is an anti-convulsant and sedative Schedule IV controlled substance. It is commonly marketed as Activan and Klonopin.

14.     Carisoprodol is a muscle relaxant controlled substance whose active ingredient metabolizes into Meprobamate, a Schedule IV anti-anxiety medication.   It is commonly marketed as Soma.

15.     Suboxone and Subutex are Schedule III controlled substances prescribed for the treatment of opioid addiction.   Because these drugs are more potent than morphine as an analgesic and produce dose-related euphoria, respiratory depression and sedation, they are subject to abuse, diversion, and trafficking by those seeking an opiate high and therefore must be carefully monitored by the physician.

16.     A combination of opiates, sedatives and muscle relaxants is desirable for drug addicted people to obtain based on their physiological and physical qualities and morphine or heroin-like effects.   The street terminology for the combination of these drugs is known as the "holy trinity" or "trinity."   These drugs are commonly sold illicitly by drug traffickers and dealers to addicts for an amount greater than what is usually paid to the pharmacy and to the doctor for the prescription.   Prescription opioids (schedule II and schedule III) are commonly known as "painkillers."

17.     A Schedule II drug has a high propensity for physical dependence, and a high potential for psychological dependence, and the Schedule II marketed drug Oxycontin contains a time release capsule that, if improperly used, allows for the immediate release of the entire opiate dosage into the bloodstream which increases the likelihood of an over dosage by the user.

18.     Schedule II, III, IV, and V controlled substances require written prescriptions. Prescriptions are only legal when they are written for a legitimate medical purpose in the usual course of a professional practice.

19.     The term "dispense" means to cause the delivery of a controlled substance to an ultimate user by and pursuant to a lawful order of a practitioner, including a prescription written by a practitioner.   A "practitioner" means a medical doctor, physician, or other individual licensed, registered or otherwise permitted by the United States or the jurisdiction in which he practices to dispense a controlled substance in the course of professional practice.

20.     The DEA issues registration numbers to qualifying doctors, who become authorized to dispense Schedule II, III, IV, and V controlled substances.

**B.     CONSPIRACY:**

21.     Beginning at a time unknown, but prior to November 2003, and continuing to on or about the date of this indictment, in the Eastern District of Louisiana, and elsewhere, the defendants, **TIFFANY MILLER, a/k/a Tiffany Cardwell, a/k/a Tiffany Gambino** (hereinafter **"MILLER"**), **JOSEPH MOGAN, III, M.D.** (hereinafter **"MOGAN"**), and **DONALD NIDES** (hereinafter **"NIDES"**), did knowingly and intentionally combine, conspire, confederate and agree with each other and with other persons known and unknown to the grand jury to dispense quantities of oxycodone (oxycontin), opana, MS contin, methodone, hydromorphone, hydrocodone, alprazolam, diazepam, clonazepam, butalbital, carisprodal, and other Schedule II, III, and IV controlled substances outside the scope of professional practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Section 841(a).

**C.     MANNER AND MEANS OF THE CONSPIRACY:**

22.     It was part of the conspiracy that the defendants, **MILLER, MOGAN,** and **NIDES,** operating individually, or together, or with others known and unknown to the Grand Jury, carried out the conspiracy through the following manner and means, among others:

a.      **MILLER** and **MOGAN** organized and operated pain management clinics which were, in fact, "pill mills" that claimed to offer patients "pain management" but ultimately did little more than write prescriptions, usually for narcotic controlled substances and other drugs that the patients desired, which prescriptions were illegal because they were not written for a legitimate medical purpose within the bounds of a professional medical practice, but rather they were written to sell for cash to the patients;

b.      **MILLER** and **MOGAN** organized and operated pain management clinics that primarily accepted cash from the patients as payment.   The clinics did not accept Medicaid, Medicare, or private insurance;

c.      **MILLER** and **MOGAN** organized and operated pain management clinics where patients arrived at the clinic, then waited usually several hours before being seen by a doctor on a first-come, first-served basis;

d.      **MILLER** and **MOGAN** organized and operated pain management clinics in which the "medical staff" assisting the doctors and patients usually had little or no formal medical training;

e.      **MILLER** and **MOGAN** organized and operated pain management clinics in which the cost of a doctor visit was determined by the type of controlled substances the patient wanted and/or was found on his pharmacy profile.   The cost of a doctor visit was higher for a patient who requested Schedule II drugs than for a patient who requested Schedule III drugs;

f.      **MILLER** and **MOGAN** organized and operated pain management clinics which required patients to pay cash for a doctor's visit, with a price based in part on the schedule of the drug sought, all before the patient ever saw the doctor;

6

g.      **MILLER** and **MOGAN** organized and operated pain management clinics in which **MOGAN** would prescribe controlled substances without determining a sufficient medical necessity for the controlled substances;

h.      **MILLER** and **MOGAN** organized and operated pain management clinics in which patients were not required to provide adequate histories nor were diagnostic tests normally ordered or performed and few referrals to medical specialists were made;

i.      **MILLER** and **MOGAN** organized and operated pain management clinics that primarily engaged in the long term prescribing of addictive narcotics and other drugs to patients with little or no investigation into a patient's past use of prescription drugs and without consultation with a patient's prior physician(s) to verify whether the patient had chronic or intractable pain and was not a drug seeker or a drug abuser;

j.      **MILLER** and **MOGAN** organized and operated pain management clinics in which "alternative" medical treatments were primarily offered, not to meet the medical needs of the patient, but to give the appearance to the DEA that the clinics had a full range of medical services and were not operating as "pill mills," selling narcotics and other drug prescriptions for cash.   Alternative medical treatments included use of a vibrating chair or table, ultrasound, the use of a silver "healing wand" and hat, the use of the doctor's hands to touch near female patients' abdomens in the claimed attempt to induce "orgasmic" sensations for the purpose of healing patients whom **MOGAN** perceived to have been sexually abused.

k.      **MILLER** and **MOGAN** organized and operated pain management clinics in which there was no individualized treatment plan for patients, but most patients were placed on a long term regimen of a combination of highly addictive drugs, mostly painkillers, including opiates, sedatives, and muscle relaxants.   **MOGAN** would occasionally change the quantity and

marketing brands of drugs prescribed to patients in an attempt to disguise the continuous prescribing of particular types of prescription painkillers and related drugs.

l.      **MILLER** and **MOGAN** organized and operated pain management clinics where most patients were unable to obtain a copy of their own medical records from the clinics without a court order;

m.      **MILLER** and **MOGAN** organized and operated pain management clinics where on occasion fraudulent MRIs were created on a computer to support a patient's medical complaint so that a patient would have a false medical record that could be used to fraudulently support the medical treatment of prescribing narcotics and related drugs;

n.      **MILLER** and **MOGAN** organized and operated pain management clinics where staff doctors would allow **MOGAN** to conduct the initial visit with the patient, write the initial prescriptions, and the staff doctors would continue the same prescribing practice over the long term;

o.      **MILLER** and **MOGAN** organized and operated pain management clinics where **MILLER** threatened to reduce the salary of and ultimately to terminate a doctor because he did not see enough patients each day and did not prescribe as **MILLER** requested;

p.      **MILLER** and **MOGAN** organized and operated pain management clinics where **MOGAN** told a doctor to prescribe the drugs that patients requested or run the risk of having the patients quit the clinic and take other patients with them;

q.      **MILLER** and **MOGAN** organized and operated pain management clinics which prescribed painkillers and related drugs to patients who were under the influence of controlled substances at the time of the doctor's visit;

r.      **MILLER** and **MOGAN** organized and operated pain management clinics where it was often obvious that some of the patients were under the influence of narcotics while waiting to see a doctor and that other patients were talking about swapping or were swapping drugs while waiting to see a doctor.   On occasion when patients were obviously under the influence of drugs, **MILLER** would have them return in the late afternoon so that the effect of the drugs would have worn off and the patients could obtain a prescription and have it filled at a pharmacy without it being obvious that they were still under the influence of drugs.

s.      **MILLER** and **MOGAN** organized and operated pain management clinics where **MOGAN** would routinely increase the quantity of the controlled substance prescribed at the request of the patient and not for legitimate medical purposes. **MOGAN** would not increase the quantity of prescription drugs further if he thought it would raise a "red flag" with the DEA;

t.      **MILLER** and **MOGAN** organized and operated pain management clinics where meaningful physical examinations of the patients were not done.   **MOGAN** rarely conducted a physical examination or even touched his patients;

u.      **MILLER** and **MOGAN** organized and operated pain management clinics where from time-to-time **MILLER** was illegally obtaining prescription drugs from patients at the clinics for her own use and the use of her then husband;

v.      **MILLER** and **MOGAN** organized and operated pain management clinics, where over a long term, **MOGAN** prescribed a combination of painkillers and related drugs for **MILLER**;

9

      w.    **MILLER** and **MOGAN** organized and operated pain management clinics where several of the clinic staff members over a long term were receiving a combination of painkillers and related drugs prescribed by **MOGAN**;

      x.    **MILLER** and **MOGAN** organized and operated pain management clinics where employees were told that if patient family members called about a patient abusing prescribed drugs, the employee was not to discuss the matter with the family member, but instead, simply suggest that the patient's perceived problems were based on hearsay and falsely claim that federal regulations, *i.e.*, HIPAA, would not allow any further discussion with the caller about the patient based on claimed confidentiality concerns;

      y.    **MILLER** and **MOGAN** organized and operated pain management clinics where on occasion, MILLER would arrange for free doctor visits, free prescriptions, and would distribute narcotics to a particular patient with whom she was having an intimate relationship;

      z.    **MILLER** and **MOGAN** organized and operated pain management clinics where patients drove long distances from other states and from within the State of Louisiana to obtain   prescriptions that were not available at medical clinics operating within legitimate medical bounds;

      aa.    **MILLER** and **MOGAN** organized and operated pain management clinics where they told a staff member to complete "wellness forms" for patients when the patients were too impaired from drug use to prepare the "wellness forms" themselves;

      bb.    **MILLER** and **MOGAN** organized and operated pain management clinics that applied for and received a license to dispense Suboxone and Subutex to patients addicted to opioids for maintenance and detoxification treatment without disclosing that the Omni Clinics

were systematically prescribing addictive painkillers and related drugs to patients for no legitimate medical purpose and only for profit;

cc.    **MILLER** and **MOGAN** organized and operated pain management clinics which would continue the long-term prescribing of painkillers even when patients routinely over a long term reported at doctor visits that they continued to be in severe pain, an indication that the long-term prescribing regime was not an effective treatment because it failed to reduce the severity of the pain;

dd.    **MILLER** and **MOGAN** organized and operated pain management clinics where a patient was asked to recruit other patients who would seek medical assistance other than requesting painkiller prescriptions so that the Omni Clinics would "appear" to be legitimate medical clinics and not "pill mills;"

ee.    **MILLER** and **MOGAN** organized and operated pain management clinics where **MOGAN** would prescribe anti-inflammatories along with narcotics and then insist that the anti-inflammatory prescription be filled, not for the patient's welfare, but to make it appear to law enforcement that **MOGAN** was not just prescribing "dope" (Schedule II and III) to his patients;

ff.    **MILLER** and **MOGAN** organized and operated pain management clinics where **MOGAN** insisted that a patient fill his anti-inflammatory prescriptions, not for the patient's medical needs, but to make **MOGAN** " look like a real legitimate doctor" and the patient "look like a real pain patient" to the DEA;

gg.    **MILLER** and **MOGAN** organized and operated pain management clinics where **MILLER** performed sex acts with NOPD officer and deputized DEA Tactical Diversion Task Force member **NIDES,** made cash payments to, and provided gifts to **NIDES,** in exchange for **NIDES** using his law enforcement position to assist **MILLER** and **MOGAN** in operating the

Omni Clinics as "pill mills" while concealing the "pill mill" activities of the Omni Clinics and **MILLER** and **MOGAN** from law enforcement authorities.   **NIDES** failed to carry out his responsibilities as a law enforcement officer including protecting the public by enforcing federal and state narcotics laws, and investigating and prosecuting the Omni Clinics and the owners for operating "pill mills" with the objective of selling prescriptions for cash profit;

hh.   From 2004 to March 2008, **NIDES**, as a NOPD officer and deputized DEA Tactical Diversion Task Force member, recognized that the Omni Clinics were operating as "pill mills" for drug seekers and drug abusers, and despite his knowledge of the illegal activities of the Omni Clinics, **MILLER** and **MOGAN**, he failed to investigate or refer for prosecution the Omni Clinics, or its owners and operators, and also failed to disclose the true nature of the unlawful activities occurring daily at the Omni Clinics, or his own actions with **MILLER** and the Omni Clinics where **MILLER** was performing sex acts with **NIDES** and paying him cash in return for **NIDES** assisting **MILLER** and **MOGAN** in attempting to evade law enforcement investigation and prosecution of the "pill mill" activities of the Omni Clinics;

ii.   **NIDES** not only failed to investigate the illegal activities of **MILLER,** **MOGAN,** and the Omni Clinics, but also aided in the illegal drug dispensing operations of the Omni Clinics by disclosing to **MILLER** those "pill mill" practices that the DEA viewed as "red flags" when investigating whether a doctor or medical clinic was operating as a "pill mill" and not as a legitimate medical clinic, which included the following:

(1).   **NIDES** advised **MILLER** that DEA in its surveillances sought to determine whether large numbers of patients arrived early at clinics, and waited outside until seen by the doctor, and instructed her to prohibit patients from congregating outside the clinic.   Based upon **NIDES'** advice, **MILLER** instituted a policy where only a limited number of patients could

stay in the Omni Clinics' waiting rooms, while the remaining patients had to return to their automobiles while waiting to see the doctors;

(2).    **NIDES** advised **MILLER** that DEA looked for clinic staff members mingling with patients waiting outside the clinic, and instructed her to prohibit that conduct.   Based upon **NIDES**' advice, **MILLER** established that policy at the Omni Clinics;

(3).    **NIDES** advised **MILLER** that DEA reviewed prescriptions to determine if more than one Schedule II controlled substance was prescribed for a patient during one doctor visit, and instructed her that the doctors should not prescribe two Schedule II controlled substances together, but rather, doctors should prescribe a Schedule II narcotic and a Schedule III narcotic;

(4).    **NIDES** advised **MILLER** that the DEA reviewed prescriptions to determine if clinics prescribed the same combination of drugs, same quantity and market brand over long periods of time, including the "holy trinity," and instructed her that the doctors should occasionally change the quantity and marketing brand of the drugs prescribed to patients even though still prescribing the same types, combinations, and strengths of painkillers and related drugs;

(5).    **NIDES** advised **MILLER** that DEA surveilled clinic parking lots to determine the number of out of state patients that were going to the Omni Clinics.   **MILLER** then restricted out of state patients from the Omni Clinics other than those patients from Mississippi who went to Omni Plus in Slidell, Louisiana;

(6).    **NIDES** advised **MILLER** that DEA reviewed the number of patients seen by a clinic on any given day and instructed her to establish quotas for the number of patients seen in one day by each clinic;

jj.      **MILLER** and **NIDES** disguised the corrupt nature of their relationship by claiming that **MILLER** was a cooperating individual ("CI") providing **NIDES** with information about possible state crimes.   **NIDES** would appear at the Omni Clinics to meet with **MILLER** to "obtain" a list of "doctor shoppers" who were allegedly violating state narcotics laws by seeking prescriptions from more than one doctor;

kk.      In February 2008, **NIDES** leaked confidential information to **MILLER** that the DEA would be executing a search warrant the next day on a "pain management" clinic managed by **MILLER's** sister;

ll.      During 2008, **NIDES** and **MILLER** continued to communicate about a DEA investigation into the illegal activities of the Omni Clinics, **MOGAN**, **MILLER**, **NIDES**, and others;

mm.      In or about September 2011, in the Eastern District of Louisiana, in a matter within the jurisdiction of the United States Department of Justice, Drug Enforcement Administration, an agency of the United States, the defendant, **DONALD NIDES**, knowingly and willfully made false, fictitious, and fraudulent material statements and representations to a Drug Enforcement Administration special agent, in that defendant **NIDES** denied that he told **MILLER** about the scheduled search of the Global Health Care (hereinafter, "Global"), denied that he had a telephone conversation with **TIFFANY MILLER** on February 11, 2008, after a law enforcement meeting to plan the search of Global, and denied that he had more than one short telephone conversation with **MILLER** on the date of the search, February 12, 2008, when in fact, as the defendant well knew, soon after the February 11, 2008 pre-search meeting, **NIDES** had a telephone conversation with **MILLER** where he disclosed the scheduled search and on the day of

14

the search, February 12, 2008, **NIDES** had approximately six (6) telephone conversations with **MILLER** where he disclosed information about the search of Global.

## D.    OVERT ACTS:

On or about the following dates, in furtherance of and to conceal the nature of the conspiracy and to accomplish its purposes, **MOGAN, MILLER, or NIDES,** or others committed the following overt acts, among others, in the Eastern District of Louisiana and elsewhere:

1.    From in or about November 2003 to the date of this indictment, **MILLER, MOGAN,** and others have operated the Omni Clinics as "pill mills" in the manner and through the means set forth in section C of Count One of the indictment.

2.    From 2004 to the date of this indictment, **NIDES, MILLER,** and **MOGAN** engaged in the conduct set forth in Section C of Count One of this indictment to assist in operating the Omni Clinics as "pill mills" while concealing the "pill mill" activities of the Omni Clinics and **MOGAN'S, MILLER'S** and **NIDES'** roles in those activities from law enforcement.

3.    In or about October 2008 through in or about May 2009, **MOGAN,** aided and abetted by **MILLER,** did knowingly and intentionally dispense the below-listed controlled substances, outside the scope of professional practice and not for a legitimate medical purpose, when **MOGAN** provided prescriptions for cash to an individual whom **MOGAN** did not know at the time was working in an undercover capacity for the DEA:

| Date | Doctor | Controlled Substances & Schedule | Schedule |
|------|--------|----------------------------------|----------|
| 10/02/08 | **MOGAN** | 45 Oxycontin (80 mg) 60 Lorcet (10 mg) 60 Soma | Schedule II Schedule III |
| 10/14/08 | **MOGAN** | 52 Oxycontin (80 mg) | Schedule II |
| 10/28/08 | **MOGAN** | 60   Oxycontin (80 mg) | Schedule II |
| 11/11/08 | **MOGAN** | 60 Oxycontin (80 mg) | Schedule II |
| 11/25/08 | **MOGAN** | 60 Oxycontin (80 mg) | Schedule II |
| 12/16/08 | **MOGAN** | 90 Oxycontin (80 mg) | Schedule II |

| Date | Doctor | Controlled Substances & Schedule | Schedule |
|---|---|---|---|
| 01/08/09 | **MOGAN** | 60 Oxycontin (80 mg)<br>45 xodol 10/300mg | Schedule II<br>Schedule III |
| 01/22/09 | **MOGAN** | 75 Oxycontin (80 mg)<br>60 xodol 10/300mg | Schedule II<br>Schedule III |
| 02/05/09 | **MOGAN** | 75 Oxycontin (80 mg)<br>60 xodol 10/300mg | Schedule II<br>Schedule III |
| 02/18/09 | **MOGAN** | 75 Oxycontin (80 mg)<br>60 xodol 10/300mg | Schedule II<br>Schedule III |
| 03/04/09 | **MOGAN** | 75 Oxycontin (80 mg)<br>60 xodol 10/300mg | Schedule II<br>Schedule III |
| 05/07/09 | **MOGAN** | 75 Oxycontin (80 mg)<br>60 xodol 10/300mg | Schedule II<br>Schedule III |

4.      In operating the Omni Clinics as primarily cash businesses, **MILLER** and **MOGAN** at first did not have bank accounts for the Omni Clinics but at the end of each business day they divided the accumulated cash revenue received from the clinics' patients.   **MILLER** kept large sums of the cash in a safe at her residence at 4501 Gary Mikel Drive, Metairie, Louisiana.

5.      From in or about November 2003 through the date of this indictment and after opening bank accounts for the Omni Clinics, **MILLER** and **MOGAN** caused to be deposited the following accumulated amounts of cash, bank transfers, and other proceeds into the identified bank accounts of Omni, Omni Plus, **MILLER**, and **MOGAN** during the specified time periods:

| Date | Bank | Account Authorization Relating to Miller and Mogan | Approximate Amount of Proceeds Deposited and Bank Transfers |
|---|---|---|---|
| 11/2003 - 02/2007 | Capital One (Omni)<br>Acct. # xxxxxx8373 | MILLER & MOGAN | $3,117,000 |
| 11/2003 – 11/2004 | Bank One (Mogan)<br>Acct # xxxxxx2615 | MOGAN | $572,193 |
| 07/2004 - 02/2007 | Capital One (Omni Plus)<br>Acct. # xxxxxx8543 | MILLER & MOGAN | $1,613,000 |
| 12/2004 – 08/2008 | Capital One (Mogan)<br>Acct. # xxxxxx8441 | MOGAN | $1,072,581 |
| 2005 – 2007 | Capital One (Mogan)<br>Acct. # xxxxxx0519 | MOGAN | $1,623,654 |

| Date | Bank | Account Authorization Relating to Miller and Mogan | Approximate Amount of Proceeds Deposited and Bank Transfers |
|---|---|---|---|
| 02/2007 - 09/2007 | Hancock Bank (Omni) Acct. # xxxxxx0150 | MILLER & MOGAN | $495,236 |
| 02/2007 - 09/2007 | Hancock Bank (Omni) Acct. # xxxxxx0258 | MILLER & MOGAN | $526,874 |
| 09/2007 - 09/2011 | Chase (Omni) Acct. # xxxxxx2631 | MILLER & MOGAN | $3,359,578 |
| 09/2007 - 09/2011 | Chase (Omni Plus) Acct. # xxxxxx2664 | MILLER & MOGAN | $2,679,459 |
| 09/2007 - 06/2008 | Chase (Mogan) Acct. # xxxxxx2748 | MOGAN | $578,198 |
| 05/2008 - 05/2009 | Chase (Omni) Acct. # xxxxxx9631 | MILLER | $693,902 |
| 05/2008 – 05/2009 | Chase (Omni Plus) Acct. # xxxxxx9623 | MILLER | $508,318 |
| 07/2008 – 11/2009 | Chase (Mogan) Acct. # xxxxxx9657 | MOGAN | $499,144 |
| 10/2008 – 03/2010 | Chase (Miller) Acct. # xxxxxx2350 | MILLER | $1,119,374 |
| 12/2009 – 06/2013 | Whitney (Mogan) Acct. # xxxxxx5396 | MOGAN | $1,624,546 |
| 01/2010 – 05/2013 | Chase (Miller) Acct. # xxxxxx3583 | MILLER | $1,736,709 |

6.      In an interview with a special agent of the DEA in September 2011, **NIDES** falsely stated that he had no telephone conversation with **MILLER** on February 11, 2008, and that he did not tell her about the planned search of Global scheduled for the next day, when in fact, **NIDES** had a telephone conversation with **MILLER** on February 11, 2008, only minutes after he attended the DEA search/planning meeting and told **MILLER** about the planned search.

7.      In September 2011, **NIDES** falsely told a special agent of the DEA that he had no more than one conversation with **MILLER** on the day of the Global search, February 12, 2008, and did not talk to her about that search, when in fact, on that day there were approximately six (6) telephone calls between **NIDES** and **MILLER** including a seven minute and a 36 minute conversation where they discussed the Global search.

8.     In September 2011, **NIDES** falsely stated to a special agent of the DEA that he did not have a telephone conversation with the owner of Global on February 12, 2008, when in fact, **NIDES** had a two minute conversation with the owner of Global during the execution of the warrant where he denied responsibility for the search.

9.     In January 2013, **NIDES** falsely denied to a special agent of the DEA that he ever engaged in sex acts with **MILLER** and also falsely denied that he was ever with **MILLER** at the Omni Clinic in Metairie, Louisiana after 5:00 p.m., when in fact, **NIDES** and **MILLER** did engage in sex acts, and did so on occasion at the Omni Clinic after 5:00 p.m.

10.    In January 2013, after **NIDES** reviewed telephone toll records for (504) 415-9069 (assigned to him by DEA) which showed telephone calls between **NIDES** and **MILLER** on February 11 and 12, 2008, NIDES falsely stated to a special agent of the DEA that if he did have telephone conversations with **MILLER** on those days, that he never provided **MILLER** information about the Global search, when in fact, **NIDES** had telephone conversations with **MILLER** on those days where he revealed information to her about the search of Global.

All in violation of Title 21, United States Code, Section 846.

## COUNT 2
(Use of a Telephone to Facilitate the Conspiracy)

**A.     AT ALL TIMES MATERIAL HEREIN:**

1.     The allegations in the paragraphs contained in Count 1, Sections A, C, and D are incorporated as though fully set forth herein.

**B.     USE OF COMMUNICATION FACILITY:**

2.     On or about March 7, 2008, in the Eastern District of Louisiana, defendant **DONALD NIDES** did knowingly and intentionally use a communication facility, a telephone, in facilitating the conspiracy to dispense Schedule II, III, and IV controlled substances in violation of Title 21, United States Code, Section 846, as set forth in Count 1 of this indictment, all in violation of Title 21, United States Code, Section 843(b).

## COUNT 3
(Conspiracy to Commit Money Laundering)

**A.**   **AT ALL TIMES MATERIAL HEREIN:**

1.     The allegations in the paragraphs contained in Count 1, Sections A, C, and D are incorporated as though fully set forth herein.

**B.**   **CONSPIRACY:**

2.     Beginning at a time unknown but prior to November 2003, and continuing to on or about the date of this indictment, in the Eastern District of Louisiana, and elsewhere, the defendants **TIFFANY MILLER, a/k/a Tiffany Cardwell, a/k/a   Tiffany Gambino** (hereinafter "**MILLER**"), **JOSEPH MOGAN, III, M.D.** (hereinafter "**MOGAN**"), did knowingly combine, conspire, confederate, and agree with each other and with other persons known and unknown to the grand jury to conduct financial transactions affecting interstate commerce, which financial transactions were in fact derived from the proceeds of specified unlawful activity, that is conspiracy to unlawfully dispense controlled substances, in violation of Title 21, United States Code, Section 846, as set forth in Count 1 of this indictment, knowing that the financial transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and with the intent to promote the carrying on of the said specified unlawful activity and, that while conducting or attempting to conduct such financial transactions, the defendants knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

## C.    OVERT ACTS:

3.    During the course and in furtherance of the conspiracy, in addition to other acts, the defendants **MILLER** and **MOGAN**, with others known and unknown to the grand jury, did:

a.    establish multiple financial accounts in their names and in the Omni Clinics' names and change the accounts on occasion, while making cash deposits of the proceeds derived from the Omni Clinics' operations;

b.    liquidate financial accounts at the Hartford Life Insurance Company, in the name of Omni Pain Management Retirement Trust, LLC which included two whole-life policies and two flexible premium-deferred annuities, funded by illicit proceeds derived from the unlawful dispensing of narcotics and other drugs at the Omni Clinics, and the funds in part, were deposited into a bank account at the Whitney National Bank in the trust fund account of an attorney;

c.    use approximately $50,000.00 of illicit proceeds derived from the unlawful dispensing of narcotics and other drugs at the Omni Clinics to purchase a building at 700 Gause Blvd., Unit B1, Suite 101A, Slidell, Louisiana where their second clinic, Omni Plus, was then operated;

d.    use illicit funds derived from the unlawful dispensing of narcotics and other drugs at the Omni Clinics to make payments on the mortgage note for the **MILLER** residence at 4501 Gary Mikel Avenue, Metairie, Louisiana;

e.    use illicit proceeds ultimately derived from the unlawful dispensing of narcotics and other drugs at the Omni Clinics to purchase eight acres of real estate and a house at 84463 Camus Lane, Covington, Louisiana, for **MILLER** to own as a residence and to operate as a horse farm, though titling the property in the name of S&C Trust I, with **MILLER** as the trustee;

20

f.      deposit or instruct others to deposit illicit proceeds derived from the

unlawful dispensing of narcotics and other drugs at the Omni Clinics into the financial accounts as

set forth in Overt Act 5, Section D of Count 1 of this indictment;

g.      purchase other properties with illicit proceeds derived from the unlawful

dispensing of narcotics and other drugs at the Omni Clinics; and

h.      transfer illicit proceeds derived from the unlawful dispensing of narcotics

and other drugs at the Omni Clinics from the Clinics' bank accounts into **MILLER'S** and

**MOGAN'S** personal bank accounts.

All in violation of Title 18, United States Code, Section 1956(h).

**COUNT 4**
(Conspiracy by a Public Official to Accept Bribes)

**A.      AT ALL TIMES MATERIAL HEREIN:**

1.      The allegations in the paragraphs contained in Count 1, Sections A, C, and D are

incorporated as though fully set forth herein.

**B.      CONSPIRACY TO RECEIVE BRIBES**

2.      Beginning at a time unknown but prior to December 2004 and continuing to on or

about the date of this indictment, in the Eastern District of Louisiana, and elsewhere, defendant

**DONALD NIDES** (hereinafter "**NIDES**"), did knowingly and intentionally combine, conspire,

confederate, and agree with other persons known to the Grand Jury to violate Title 18, United

States Code, Section 201(b)(2), in that **NIDES**, while serving as a public official deputized as a

DEA Tactical Diversion Task Force member, did conspire to corruptly demand, seek, receive, and

accept something of value personally, in return for being influenced in the performance of official

acts in that **NIDES** did engage in sex acts with and received money from a person in return for

21

using his official position to assist Miller and Mogan in operating the Omni Clinics as "pill mills" while concealing the unlawful dispensing practices and other "pill mill" activities of the Omni Clinics, Mogan, and Miller from investigation and prosecution by law enforcement.

## C.   OVERT ACTS

3.      In furtherance of this conspiracy, defendant **NIDES** did receive cash payments and sex acts from another person in return for **NIDES** using his law enforcement position to assist Miller and Mogan in operating the Omni Clinics as "pill mills" while assisting them in evading law enforcement investigation and prosecution of the "pill mill" activities of the Omni Clinics and Miller and Mogan.   As a result, **NIDES** failed to carry out his responsibilities as a law enforcement officer of protecting the public by enforcing federal and state narcotics laws, and investigating and prosecuting the Omni Clinics and the owners for operating "pill mills" with the objective of selling prescriptions for cash profit.

All in violation of Title 18, United State Code, Section 371.

### COUNT 5
(Conspiracy to Illegally Receive Property from Another Under Color of Official Right)

## A.   AT ALL TIMES MATERIAL HEREIN:

1.      The allegations in the paragraphs contained in Count 1, Sections A, C, and D are incorporated as though fully set forth herein.

## B.   CONSPIRACY TO OBTAIN PROPERTY FROM ANOTHER UNDER COLOR OF OFFICIAL RIGHT:

2.      Beginning at a time unknown but prior to December 2004 and continuing to on or about the date of this indictment, in the Eastern District of Louisiana, and elsewhere, defendant **DONALD NIDES** (hereinafter "**NIDES**") did knowingly and intentionally combine, conspire,

confederate, and agree with other persons known to the Grand Jury to obstruct, delay, and affect commerce as that defined in Title 18, United States Code, Section 1951(b)(3), by extortion, as that term is defined in Title 18, United States Code, Section 1951(b)(2), in that **NIDES,** while serving as a public official, that is, a New Orleans Police Department officer and a deputized member of the DEA Tactical Diversion Task Force Squad, did conspire to receive money from a person, with consent induced under color of official right, which property was not due the defendant or his office.

## C.    OVERT ACTS

3.      In furtherance of this conspiracy, defendant **NIDES** did receive cash payments from another person in return for **NIDES** using his law enforcement position to assist Miller and Mogan in operating the Omni Clinics as "pill mills" while assisting them in evading law enforcement investigation and prosecution of the "pill mill" activities of the Omni Clinics and Miller and Mogan.   As a result, **NIDES** failed to carry out his responsibilities as a law enforcement officer of protecting the public by enforcing federal and state narcotics laws, and investigating and prosecuting the Omni Clinics and the owners for operating "pill mills" with the objective of selling prescriptions for cash profit.

All in violation of Title 18, United States Code, Section 1951.

### COUNT 6
(Obstruction of Justice to Prevent Communication to
Law Enforcement About Federal Crimes)

## A.    AT ALL TIMES MATERIAL HEREIN:

1.      The allegations in the paragraphs contained in Count 1, Sections A, C, and D are incorporated as though fully set forth herein.

**B.**     **OBSTRUCTION OF JUSTICE**

2.     From on or about March 14, 2008, and continuing to on or about the date of this indictment, in the Eastern District of Louisiana, and elsewhere, defendant **DONALD NIDES**, did knowingly attempt to intimidate, threaten, and corruptly persuade another person, with the intent to hinder, delay, and prevent the communication to a law enforcement officer of information relating to the commission of federal offenses as set forth in Counts 1, 4, and 5 of this indictment, in violation of Title 18, United States Code, Sections 1512(b)(3) and 2.

**COUNT 7**
(False Statements to a Federal Agent)

In or about September 2011, in the Eastern District of Louisiana, in a matter within the jurisdiction of the United States Department of Justice, Drug Enforcement Administration, an agency of the United States, the defendant, **DONALD NIDES** (hereinafter **"NIDES"**), knowingly and willfully made false, fictitious, and fraudulent material statements and representations to a Drug Enforcement Administration special agent, in that defendant **NIDES** falsely denied that he told Miller about the scheduled search of Global Health Care (hereinafter, "Global"), denied that he had a telephone conversation with Miller on February 11, 2008, after a law enforcement meeting to plan the search of the Global, and denied that he had more than one short telephone conversation with Miller on the date of the search, February 12, 2008, when in fact, as the defendant well knew, soon after the February 11, 2008, pre-search meeting, **NIDES** had a telephone conversation with Miller where he disclosed the scheduled search, and on the day of the search, February 12, 2008, **NIDES** had approximately six (6) telephone conversations with Miller where he disclosed information to Miller about the Global search, in violation of Title 18, United States Code, Section 1001.

## COUNT 8
### (False Statements to a Federal Agent)

In or about January 2013, in the Eastern District of Louisiana, in a matter within the jurisdiction of the United States Department of Justice, Drug Enforcement Administration, an agency of the United States, the defendant, **DONALD NIDES** (hereinafter "**NIDES**"), knowingly and willfully made false, fictitious, and fraudulent material statements and representations to a Drug Enforcement Administration special agent, in that defendant **NIDES** falsely denied that he ever engaged in sex acts with Miller and also falsely denied that he was ever with Miller at the Omni Clinic in Metairie, Louisiana after 5:00 p.m., when in fact, **NIDES** and Miller did engage in sex acts, and did so, on occasion, at the Omni Clinic after 5:00 p.m., in violation of Title 18, United States Code, Section 1001.

## COUNT 9
### (False Statements to a Federal Agent)

In or about January 2013, in the Eastern District of Louisiana, in a matter within the jurisdiction of the United States Department of Justice, Drug Enforcement Administration, an agency of the United States, the defendant, **DONALD NIDES** (hereinafter "**NIDES**"), knowingly and willfully made false, fictitious, and fraudulent material statements and representations to a Drug Enforcement Administration special agent, in that defendant **NIDES,** after he reviewed telephone toll records for (504) 415-9069 (assigned to him by DEA) which showed telephone calls between **NIDES** and Miller on February 11 and 12, 2008, falsely stated that if he did have telephone conversations with Miller on those days, that he never provided Miller information about the Global search, when in fact, **NIDES** had telephone conversations with Miller on those days where he revealed information to her about the search of Global, in violation of Title 18, United States Code, Section 1001.

## NOTICE OF DRUG FORFEITURE

1.      The allegations of Counts 1 and 2 of this Indictment are realleged and incorporated

by reference as though set forth fully herein for the purpose of alleging forfeiture to the United

States of America pursuant to the provisions of Title 21, United States Code, Section 853.

2.      As a result of the offenses alleged in Counts 1 and 2, defendants, **TIFFANY**

**MILLER, a/k/a Tiffany Cardwell, a/k/a Tiffany Gambino, JOSEPH J. MOGAN, III, M.D.**

and **DONALD NIDES,** shall forfeit to the United States pursuant to Title 21, United States Code,

Section 853, any and all property constituting or derived from any proceeds the defendants

obtained directly or indirectly as a result of the said violations and any and all property used or

intended to be used in any manner or part to commit and to facilitate the commission of the

violations alleged in Counts 1 and 2 of this Indictment, including, but not limited to:

> $10,054 U.S. Currency seized from Derek Gambino;
>
> $7,500 U.S. Currency J.P. Morgan Chase Bank Cashier's Check Number: 9227916481, seized from Joseph J. Mogan III, M.D.;
>
> $2,088.53 in U.S. Currency seized from Whitney Bank, Account Number: 02-045980461, in the name of S&C Trust 1/Tiffany Rae Miller, Trustee;
>
> $404,282.61 in U.S. Currency seized from Whitney Bank, Account Number: 02-0455980445, in the names of Tiffany Rae Miller and Derek Gambino;
>
> $30,608.05 in U.S. Currency seized from J.P. Morgan Chase Bank, Account Number: 960453512, in the name of Omni Pain Management, LLC;
>
> $10,634.42 in U.S. Currency seized from J.P. Morgan Chase Bank, Account Number: 960453496, in the name of Omni Pain Management Plus, LLC;

Property currently recorded in the name of Tiffany Rae Miller-Cardwell and described as follows: All that certain piece or portion of ground, together with all of the buildings and improvements thereon and all of the rights, ways, means, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining thereto situated in Sections 31 and 32, Township 4 south, Range 11, east, containing 8.02 acres, more or less, in St. Tammany Parish, Louisiana, being parcel 30B, Handsome Meadows Farms, which said parcel was created by a resubdivision of parcels 29 and 30 (created by the original subdivision plat, map file number 1245) into parcels 29A, 29B, 30A and 30B, Handsome Meadows Farms established in accordance with a resubdivision survey of John E. Bonneau and Associates, Inc. dated November 27, 2001 and filed with the Clerk of Court for St. Tammany Parish, Louisiana, as map file number 2109, as amended by Act of Correction of resubdivision plat of Handsome Meadow Farms executed by John E. Bonneau, Surveyor.  The improvements thereon bear Municipal Number: 84463 Camus Lane, Covington, Louisiana;

Property currently recorded in the names of Joseph J. Mogan, M.D. a/k/a Joseph J. Mogan, III, Tiffany Miller Cardwell, wife of/ and Steven L. Cardwell and described as follows: All that certain lot or parcel of land, together with all the buildings and improvements thereon and all of the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining situated in the Parish of St. Tammany, State of Louisiana, being more fully described as follows, to-wit: being Unit B-1 of the Doctor's Village, A Professional Office Condominium, situated in a certain parcel of land being situated in Section 3, Township 9 South, Range 14 East, City of Slidell, Parish of St. Tammany, State of Louisiana, being more fully described as follows, to-wit: commencing from the Section corner common to Sections 2, 3, 10 and 11 in said Township and Range, to North 00 degrees, 45 minutes, 35 seconds West 20.67 feet to a point; thence go South 89 degrees, 20 minutes, 32 seconds West, 600.00 feet to a point; thence go South 89 degrees, 26 minutes, 48 seconds West 87.90 feet to the point of beginning, thence from the point of beginning continue South 89 degrees, 26 minutes, 48 seconds West along the Northern Right-of-Way line of Gause Boulevard (U.S. 190) a distance of 102.10 feet to a

point; thence go North 45 degrees, 41 minutes, 13 seconds West 14.16 feet to a point; thence go along the Eastern Right-of-Way line of Ninth Street North 00 degrees, 45 minutes, 55 seconds West 279.69 feet to a point; thence go North 89 degrees, 20 minutes, 15 seconds East 200.00 feet along the Southern Right-of-Way line of Anthony Street to a point; thence go South 00 degrees, 45 minutes, 53 seconds East 147.56 feet to a point; thence go South 89 degrees, 22 minutes, 53 seconds West 87.90 feet to a point; thence go South 00 degrees, 45 minutes, 53 seconds East 142.40 feet back to the point of beginning.   Containing in all 1.04 acres of land, more or less.   All in accordance with the Doctor's Village, A Professional Office Condominium Declaration, dated November 19, 1981, filed for record November 20, 1981, recorded at COB 1038, folio 67 of the official records of the Clerk of Court, St. Tammany Parish, Louisiana. Further in accordance with Plan of Office dated May 1, 1981, filed in Clerk of Court office on November 20, 1981, filed in Condominium File, November 23, 1981, St. Tammany Parish, Louisiana; made by R.J. Gardner, entitled Plat Plan 1-P.   The improvements thereon bear the Municipal Number: 700 Gause Boulevard, Unit B-1, Suite 101, Slidell, Louisiana.

Property currently recorded in the name of Cardwell Properties II, L.L.C. and described as follows: A certain lot of parcel of land, together with all the buildings and improvements thereon, and, all rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, more fully described as being a portion of original Lot No. One (1) in Square 2 of Log Cabin Subdivision, together with a twenty (20') foot strip of ground being the East one-half (1/2) of a forty (40') foot revoked right of way, Less and Except that portion of ground sold to the City of Slidell, recorded as COB _____, folio _____, City of Slidell, St. Tammany Parish, Louisiana, situated in the South half of South half Section Two (2), Township 9 South, Range 12 East.   Altogether, said portion of ground measures 120 feet fronting on Gause Boulevard and extends 278.63 feet on the westerly sideline extending North and 279.13 feet on the easterly sideline extending North adjoining Lot 2.   All as shown on the survey of J.V. Burkes & Associates, Inc., dated February 6, 2002, Survey No. 1020332.   And further on the survey of J.V. Burkes & Associates, Inc., dated June 29, 2002, Survey No. _____.

Improvements thereon bear the Municipal Address: 1316-18 Gause Boulevard, Slidell, Louisiana.

Property currently recorded in the names of Tiffany Miller, wife of/and Steven L. Cardwell and described as follows: One certain lot of ground, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the Parish of Jefferson, State of Louisiana, in that part thereof known as Lelia Place Subdivision designated as Lot 15, Square 3, bounded by David Drive, Trenton and York Streets and the east line of subdivision.  Lot 15 commences 397 feet from the intersection of David Drive and York Street, and measures thence 55 feet front on David Drive, same width in the rear, by a depth of 145.53 feet between equal and parallel lines.  According to a survey by J.J. Krebs and Sons, dated June 30, 1967 and redated June 19, 1972, this property is exactly as described above, except Lot 15 is shown as commencing 395 feet from the intersection of David Drive and York Street; and has a five (5') foot servitude across the entire rear width of the lot.   The improvements thereon bear the Municipal Number: 2615-17 David Drive, Metairie, Louisiana.

At least $197,537.00 in United States Currency and all interest and proceeds traceable thereto.

The government specifically provides notice of its intent to seek a personal money judgment against the defendant, **TIFFANY MILLER, a/k/a Tiffany Cardwell, a/k/a Tiffany Gambino**, in the amount of the fraudulently-obtained proceeds.

3.   If any of the above described property, as a result of any act or omission of the

defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third person;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

   All in violation of Title 21, United States Code, Section 853.

## NOTICE OF MONEY LAUNDERING FORFEITURE

   1. The allegations of Count 3 of this Indictment are realleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982.

   2. As a result of the offense alleged in Count 3, defendants, **TIFFANY MILLER, a/k/a Tiffany Cardwell, a/k/a Tiffany Gambino** and **JOSEPH J. MOGAN, III, M.D.,** shall forfeit to the United States all property real or personal, involved in the aforesaid offense and all property traceable to such property which was involved in the said violations of Title 18, United States Code, Sections 1956(h) and 982.

   3. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b)(1) to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

All in violation of Title 18, United States Code, Section 982.

## NOTICE OF FORFEITURE

1.      The allegations of Counts 4 through 6 of this Indictment are realleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Sections 201, 371, 1512, 1951 and 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

2.      As a result of the offenses alleged in Counts 4 through 6, defendant, **DONALD NIDES,** shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to violations of Title 18, United States Code, Sections 201, 371, 1512 and 1951.

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred or sold to, or deposited with, a third person;

        c.      has been placed beyond the jurisdiction of the Court;

        d.      has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of said defendants up to the value of the above forfeitable

property.

All in violation of Title 18, United States Code, Sections 201, 371, 1512, 1951 and

981(a)(1)(C), made applicable through Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____
FOREPERSON


KENNETH ALLEN POLITE, JR.
UNITED STATES ATTORNEY

_____
HARRY W. MCSHERRY, JR.
Assistant United States Attorney
Louisiana Bar Roll No. 9388

_____
MICHAEL B. REDMANN
Special Assistant United States Attorney
Louisiana Bar Roll No. 31929

New Orleans, Louisiana
February 21, 2014

FORM OBD-34

No. _____

# UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Louisiana

_____ Criminal _____ Division

# THE UNITED STATES OF AMERICA

vs.

JOSEPH J. MOGAN, III, M.D.
TIFFANY MILLER, a/k/a Cardwell, a/k/a Gambino
DONALD NIDES

# INDICTMENT

INDICTMENT FOR CONSPIRACY TO ILLEGALLY DISPENSE
CONTROLLED SUBSTANCES, USE OF TELEPHONE TO
FACILITATE THE CONSPIRACY, CONSPIRACY TO COMMIT
MONEY LAUNDERING, PUBLIC OFFICIAL ACCEPTING A
BRIBE, ILLEGALLY RECEIVING "PROPERTY" FROM
ANOTHER UNDER COLOR OF OFFICIAL RIGHT,
OBSTRUCTION OF JUSTICE TO PREVENT COMMUNICATION
TO LAW ENFORCEMENT ABOUT FEDERAL CRIME, AND
FALSE STATEMENTS TO A FEDERAL AGENT

VIOLATIONS:   21 U.S.C. § 846
21 U.S.C. § 843(b)
18 U.S.C. § 1956(h)
18 U.S.C. § 1951
18 U.S.C. § 1512(b)(3)
18 U.S.C. § 1001
18 U.S.C. § 371
18 U.S.C. § 2

A true bill.

_____
Foreperson

Filed in open court this _____ day of _____
_____ A.D. 2014.

_____
Clerk

Bail, $ _____

HARRY W. MCSHERRY
Assistant United States Attorney